733 F.2d 1446
 15 Fed. R. Evid. Serv. 1781
 UNITED STATES of America, Plaintiff-Appellee,
v.
Joseph F. "Joey" ASTLING, Robert Grego, Stanley Allen Terry,
Bob Neal Carson, George Thompson, Bobby Adams
Tyson, Loren G. "Lucky" Uridel,
Defendants- Appellants.
UNITED STATES of America, Plaintiff-Appellee,
v.
Joseph F. "Joey" ASTLING, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Robert GREGO, Defendant-Appellant.
 Nos. 82-8503, 82-8559 and 82-8560.
 United States Court of Appeals,
Eleventh Circuit.
 June 7, 1984.
 
 Melissa S. Mundell, Asst. U.S. Atty., Savannah, Ga., Francis J. Martin, Appellate Sec., Crim. Div., Washington, D.C., for plaintiff-appellee.
 John Fleming, Larry Bonner, Augusta, Ga., for Astling and Grego.
 John L. Mixon, III (Court-appointed), Augusta, Ga., for Terry.
 Richard Powell (Court-appointed), Augusta, Ga., for Thompson.
 Elizabeth C. Calhoun, Augusta, Ga., for Uridel.
 John Czura, Augusta, Ga., for Carson.
 Paul W. Calhoun, Vidalia, Ga., Bruce S. Harvey, Atlanta, Ga., for Tyson.
 Appeals from the United States District Court for the Southern District of Georgia.
 Before TJOFLAT and HILL, Circuit Judges, and LYNNE*, District Judge.
 TJOFLAT, Circuit Judge:
 
 
 1
 This case involves a scheme to import marijuana by air from Jamaica and to distribute it across the United States. The pilot in the scheme had been arrested as a result of a prior marijuana smuggling flight and was working as an informant for the Drug Enforcement Administration (DEA). After he flew in the load of marijuana at issue here, DEA agents rounded up appellants Carson, Thompson, Terry, and Tyson near the unloading site; they arrested appellants Astling, Grego, Uridel, and three others over the next two months. All were charged in a four-count indictment with one or more of the following offenses: conspiracy to import marijuana, in violation of 21 U.S.C. Sec. 963 (1982); importing marijuana, in violation of 21 U.S.C. Sec. 952 (1982); conspiracy to possess marijuana with intent to distribute, in violation of 21 U.S.C. Sec. 846; and possession of marijuana with intent to distribute, in violation of 21 U.S.C. Sec. 841 (1982). They were tried together before a jury. The seven appellants were convicted on one or more counts.[1] In this appeal, appellants present among them a total of nine claims of error. We reject their claims and affirm.
 
 I.
 
 2
 In October 1981, prior to the events alleged in the indictment in this case, Benjamin Rothwell and appellants Carson, Tyson, Thompson, and Uridel smuggled a load of marijuana into the United States from Colombia, South America, by air. Verlin Seifkis piloted the plane; Rothwell was the co-pilot. The DEA learned of the smuggling and succeeded in identifying and arresting Seifkis and Rothwell. Following their arrest, Seifkis and Rothwell decided to cooperate with the DEA, and they were not prosecuted.
 
 
 3
 In January 1982 Carson contacted Rothwell in Little Rock, Arkansas and requested him to fly in another load of marijuana. Rothwell went to Carson's Ft. Lauderdale, Florida home, and Carson told him about a plan that involved a marijuana source in Jamaica. While there, Carson introduced Rothwell to appellant Astling and instructed Rothwell to report to Astling in Ocala, Florida to make final arrangements for the flight.
 
 
 4
 Rothwell arrived in Ocala on February 3, 1982, and checked into a motel. DEA agents thereafter monitored Rothwell's room by visual surveillance and by recording conversations through a "body bug" they had given Rothwell.
 
 
 5
 Astling visited Rothwell's room that evening. The two men discussed a fuel problem they were facing; the plane they would use did not have enough fuel capacity to cover the round trip to Jamaica, and the drug source in Jamaica would not be able to provide any fuel. Accordingly, they needed to have the airplane modified, or "plumbed," to carry additional fuel by installation of a polyurethane "bladder" which could carry 250-300 gallons of fuel.
 
 
 6
 The next day, Thompson came to Rothwell's motel room. Carson had previously told Rothwell that Thompson would try to arrange the necessary plumbing for the plane and would work on finding a landing site. Carson had also suggested that appellant Tyson, who was an auto mechanic, do the plumbing work, but Rothwell had rejected the idea because of the possibility that Tyson would not do the work properly.
 
 
 7
 To find a landing site, Thompson flew with Rothwell to Soperton, Georgia to meet Tyson. Tyson lived near the Soperton Airport and had suggested that they use either the Soperton Airport itself or some other private airstrips in the Soperton area.
 
 
 8
 Tyson met the men at the woods on the side of the runway and got into their plane. Tyson greeted Thompson and they turned to take off. A pickup truck with two occupants was blocking the way, however. Tyson got out of the plane and spoke with them. Upon his return he told Rothwell and Thompson that the men in the truck were concerned about people using the airstrip to smuggle marijuana without paying them, but that he had them "straightened away." Then, a police car drove up. Tyson got out again, saying that he knew the man inside, the Sheriff, and not to worry about him. After a short conversation with the Sheriff, Tyson got back into the airplane and said, "Don't worry about him, he's cool." The three men then took off.
 
 
 9
 Tyson pointed out other possible landing sites, one near Wrightsville, Georgia and two near Kite, Georgia. After deciding that the Soperton Airport was the only truly feasible site because the plane was large and the other strips were too muddy to land on, the men returned to Soperton Airport. On the way they discussed the possibility of the owner of one of the airstrips near Kite providing extra fuel for the trip. They also made arrangements for Rothwell to use radio frequency 122.7 when he flew in to Soperton that Saturday, so that Tyson could monitor that frequency. They let Tyson out at Soperton and returned to Ocala.
 
 
 10
 That evening, Thompson, Astling, and appellant Grego met with Rothwell in his room. Thompson reported that he had checked with Tyson again to be sure that nobody at the Soperton Airport would cause problems about landing the plane there. Astling introduced Grego to Rothwell as his full partner; Grego would speak for Astling and vice versa. Grego gave Rothwell directions to the airstrip in Jamaica where he would pick up the marijuana. The four men discussed again the problem of plumbing the plane for extra fuel.
 
 
 11
 On the morning of Friday, February 5, Astling, Grego, and Rothwell met for breakfast at Rothwell's motel. Grego repeated the directions to the airstrip in Jamaica and told Rothwell what he could expect to happen on the ground in Jamaica. Rothwell then went to Leesburg, Florida to see whether appellant Uridel could plumb the airplane. Rothwell and Uridel discussed the flight to Jamaica, the appropriate fuel mixture and the plumbing work, and agreed on a price. Uridel, who had known Rothwell and Carson from the October 1981 marijuana flight, discussed the purpose of the flight and the new participants, Astling and Grego. On the afternoon of February 5, Uridel and Rothwell flew to Lakeland, Florida to get the necessary parts to plumb the airplane.
 
 
 12
 On Sunday, February 7, Astling and Rothwell drove south of Ocala to check out one other possible landing site on a farm. Afterwards, Astling gave Rothwell money to pay Uridel. On Monday, February 8, as prearranged, Uridel installed the bladder and fueled the plane. On Monday night, Carson came by Rothwell's room to check the entire plan, including the landing at Soperton airport. Rothwell gave Carson a description of his airplane and the identification number painted on the plane. Carson told Rothwell he could expect to see Thompson, Tyson and codefendant Offuit (acquitted at trial) at the Soperton Airport when he arrived.
 
 
 13
 On Tuesday morning, Uridel picked up Rothwell at his hotel room and drove him to the aircraft. Rothwell flew to Jamaica, picked up the marijuana, and returned. Customs officers intercepted his flight and followed him to Orlando, where he refueled. Then they followed him to Statesboro, Georgia where he met DEA agents who removed a couple of bales of marijuana from the aircraft and placed a tracking device in one of the bales still aboard. Rothwell waited for DEA agents to position themselves at the Soperton Airport; then he flew to Soperton. Since he was to land at night, Rothwell had prearranged with Carson, Tyson and Thompson for cars to be positioned at the end of the runway and flash their headlights to mark the airstrip. Rothwell saw Thompson and some others he could not see well enough to identify. They offloaded the marijuana and Rothwell immediately took off.
 
 
 14
 Agents on the ground attempted to follow the vehicles they saw at the airport; they arrested Carson and Terry in one car. They also followed the pickup truck in which the marijuana bales had been loaded; after a high speed chase the truck pulled over and the driver, who resembled but was never positively identified as Tyson, escaped into the woods. Thompson, a passenger in the truck, was arrested. A ground to air radio was found in the truck tuned to the frequency 122.7. Other DEA agents had spent the evening watching Tyson's house. Tyson was arrested the following morning in the vicinity of the Soperton Airport. Shortly thereafter, the four were indicted for conspiracy to possess marijuana with intent to distribute, and possession with intent to distribute.
 
 
 15
 In late February Rothwell introduced DEA agent Fagan, who was posing as a pilot willing to make a smuggling flight, to Uridel. Fagan spoke with Uridel twice about the possibility of smuggling drugs from Colombia and recorded the conversations. On March 25 and 26, Rothwell recorded two long distance telephone conversations with Carson, the first a call from Carson, and the second a call from Rothwell but at Carson's direction. Carson was trying to determine who had been informing the DEA about their smuggling operation. On April 22, a grand jury returned a superseding indictment charging Carson, Terry, Thompson, Tyson, Uridel, Astling, and Grego with the counts of which they were convicted, and from which they now appeal.
 
 
 16
 At trial, the government's case consisted primarily of the testimony of Rothwell and the DEA agents who had monitored his activities as the smuggling venture unfolded. Rothwell testified at length; the DEA agents who recorded the conversations that took place in Rothwell's Ocala motel room identified the appellants who had entered that room and introduced the tapes of their conversations with Rothwell. Rothwell and Verlin Seifkis testified, over objection, about the October 1981 smuggling episode. The court admitted this testimony against the parties who had been involved in that episode under Fed.R.Evid. 404(b) to show their criminal intent in this case. The DEA agents who monitored Rothwell's flight from Jamaica and those who were at the Soperton landing site also testified.
 
 
 17
 The defendants employed a variety of tactics in an attempt to neutralize the government's proof. All the defendants impugned Rothwell's credibility. Astling and Grego, who testified, admitted their association with Rothwell but cast it in an innocent light. They explained that they had been in Ocala for a horse show where Rothwell had contacted them about a tax shelter they had previously discussed. Tyson and Uridel also testified. Tyson presented an alibi; at the time of Rothwell's landing at the Soperton Airport he was at home repairing a friend's car. Uridel testified that he performed the work on the airplane but did not know it was to be used to smuggle drugs. Each defendant presented witnesses to corroborate his explanation of the events.
 
 
 18
 The government's rebuttal was directed to Tyson's defense. DEA agents testified that they had had Tyson's house under surveillance on the night in question and that, contrary to Tyson's story, the house had been empty.
 
 
 19
 On appeal, appellants present nine claims: (1) that Thompson was entitled to the dismissal of the two additional counts against him charged in the superseding indictment because they were the product of prosecutorial vindictiveness; (2) that the district court improperly denied the defendants' motions to dismiss the indictment on the ground that marijuana is not properly classified as a Schedule I controlled substance; (3) that the district court abused its discretion by refusing to grant Astling's and Grego's motions for a continuance; (4) that the district court was not evenhanded in its jury voir dire because it excused a juror with a pro-marijuana bias immediately, but excused a juror with an anti-marijuana bias only after substantial questioning and thus violated the defendants' due process rights; (5) that the district court abused its discretion in denying Astling's, Grego's, Terry's, Tyson's and Thompson's motions for a severance after Carson's post-arrest conversations with Rothwell were introduced into evidence; (6) that the district court abused its discretion in admitting testimony of Rothwell, Verlin Seifkis, and Fagan concerning the October 1981 smuggling episode and the proposed smuggling scheme with Uridel because the prejudicial effect of the evidence outweighed its probative value; (7) that the district court abused its discretion in striking a defense witness' opinion testimony regarding Rothwell's truthfulness; (8) that the evidence against Tyson was insufficient to support his conviction; and (9) that the district court erred in refusing to conduct an evidentiary hearing prior to ordering Carson, Uridel, Astling and Grego to deposit the fines the court had imposed against them pending this appeal.
 
 II.
 A.
 
 20
 Thompson alone argues that he was entitled to the dismissal of the importation related counts against him because they were the result of prosecutorial vindictiveness. Between the two indictments the prosecutor offered Thompson a plea bargain which Thompson rejected. At the time of the offer, the prosecutor informed Thompson that, if he rejected the plea bargain, the additional charges would be pressed. Thompson argues that the prosecutor pressed the additional charges after Thompson rejected the plea bargain in order to penalize him.
 
 
 21
 The Supreme Court's opinion in Bordenkircher v. Hayes, 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978), covers this situation precisely. There the prosecutor in plea bargaining told the defendant that he would obtain a recidivist indictment in addition to the indictment on the underlying charge if the defendant did not plead guilty to the offense charged. In finding the superseding indictment permissible, the Court stated:
 
 
 22
 While the prosecutor did not actually obtain the recidivist indictment until after the plea conferences had ended, his intention to do so was clearly expressed at the outset of the plea negotiations. [The defendant] was thus fully informed of the true terms of the offer when he made his decision to plead not guilty. This is not a situation, therefore, where the prosecutor without notice brought an additional and more serious charge after plea negotiations relating only to the original indictment had ended with the defendant's insistence on pleading not guilty. As a practical matter, in short, this case would be no different if the grand jury had indicted [the defendant] as a recidivist from the outset, and the prosecutor had offered to drop that charge as part of the plea bargain.
 
 
 23
 Id. at 360-61, 98 S.Ct. at 666 (footnote omitted). Similarly, here Thompson was aware that he could face additional importation charges at the time he made his decision to plead not guilty.[2]
 
 B.
 
 24
 Appellants Astling and Grego assert that the district court erred in denying them a continuance to allow them adequately to investigate the facts of the case and Rothwell's background. They have never explained how a continuance would have helped their case, however.
 
 
 25
 The granting or denial of a continuance is a matter within the sound discretion of the district court, and when the request is denied an appellant must show an abuse of discretion and specific, substantial prejudice in order to obtain relief. United States v. Wuagneux, 683 F.2d 1343, 1355-56 (11th Cir.1982), cert. denied, --- U.S. ----, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983). See also United States v. McDonald, 672 F.2d 864, 865 (11th Cir.1982); United States v. Jimenez-Diaz, 659 F.2d 562, 567 (5th Cir. Unit B 1981), cert. denied, 456 U.S. 907, 102 S.Ct. 1754, 72 L.Ed.2d 164 (1982).[3] Because appellants have pointed to no prejudice caused by the court's failure to grant a continuance, they give us no basis for finding an abuse of discretion.
 
 C.
 
 26
 Astling, Grego, Terry, and Thompson contend that the trial court committed reversible error in denying their request for an evidentiary hearing on their claim that marijuana was improperly classified as a schedule I controlled substance. They argue that they could have shown through expert medical testimony that marijuana was not properly classified as a schedule I controlled substance and, therefore, that they should not have been prosecuted for importing it.
 
 
 27
 Appellants base their claim on one of the statutory criteria contained in 21 U.S.C. Sec. 811 for the Attorney General's placing a substance on Schedule I, namely, that it lack any accepted medical use. They offered to show that marijuana has some accepted medical use. The trial court found the classification of marijuana as a Schedule I controlled substance not irrational and refused to hold the evidentiary hearing. Federal courts, including this court, have uniformly rejected such challenges. See United States v. Middleton, 690 F.2d 820, 822-24 (11th Cir.1982); cert. denied, --- U.S. ----, 103 S.Ct. 1497, 75 L.Ed.2d 929 (1983); United States v. Gramlich, 551 F.2d 1359, 1364 (5th Cir.), cert. denied, 434 U.S. 866, 98 S.Ct. 201, 54 L.Ed.2d 141 (1977). We are bound by the prior panel rule.
 
 D.
 
 28
 Grego, Astling and Thompson seek reversal of their convictions on the ground that the district court conducted the jury voir dire in a prejudiced manner. They argue that the judge dismissed a potential juror with a pro-marijuana bias (Mr. Mock) immediately, while he dismissed a potential juror with an anti-marijuana bias (Mr. Griffin) only after substantial questioning; this favoritism, they argue, showed the judge to be biased against marijuana and operated to deny them a fair trial. They do not explain exactly how this alleged bias worked to deny them a fair trial, however.
 
 
 29
 Appellants base their argument on a faulty premise; even if a judge indicates in some way that he personally disapproves of marijuana use, this, alone, does not deny the defendant a fair trial any more than if the judge notes that he disapproves of murder. Judges are not required to have neutral feelings about crime, but only about the alleged criminal. The court may not create in the jury a predisposition toward the defendant's guilt by confusing the functions of judge and prosecutor. United States v. Robinson, 687 F.2d 359 (11th Cir.1982). Appellants do not point to any indication in the record that the judge, by word or conduct, expressed to the jury or the venire a belief in their guilt.
 
 
 30
 Furthermore, the court examined the prospective jurors about marijuana bias in an even-handed manner. After Mr. Griffin indicated only that he had "strong feelings" about marijuana, the court questioned him further outside the presence of other venire members. Even the most attentive venire member could have perceived only a mild variation between the judge's treatment of Griffin and his earlier treatment of Mr. Mock. The judge's colloquy with Mr. Mock was as follows:
 
 
 31
 THE COURT: Is there anybody here who feels it would be difficult or impossible for you to be fair and impatrial [sic] if you were selected as a juror in a case which deals so intimately with this substance, marijuana?
 
 
 32
 MR. MOCK: I'm sorry, Your Honor, I am Charles Mock. It would probably be difficult for me because I really see no harm in it.
 
 
 33
 THE COURT: You think it would be difficult for you to be fair and impartial in any case that involves the substance marijuana?
 
 
 34
 MR. MOCK: Yes, sir.
 
 
 35
 THE COURT: Mr. Mock, you are excused.
 
 
 36
 We find no error in the court's conduct.
 
 E.
 
 37
 Astling, Grego, Terry, Thompson and Tyson[4] challenge the trial court's failure to grant them a severance under Fed.R.Crim.P. 14 after the prosecution introduced into evidence tape recordings of the two post-indictment telephone conversations that took place between Carson and Rothwell. The recordings, they argue, strongly implicated them in the scheme, and they had no opportunity to cross-examine Carson. Astling, Grego and Terry also make the somewhat inconsistent argument that the court erred in denying them a severance because the case against them was so weak.
 
 
 38
 We first note that coconspirators should be tried jointly United States v. Wilson, 657 F.2d 755, 765 (5th Cir. Unit A 1981), cert. denied, 455 U.S. 951, 102 S.Ct. 1456, 71 L.Ed.2d 667 (1982), and severance is not warranted despite the fact that a defendant may have participated in only a single aspect of the conspiracy. United States v. Marszalkowski, 669 F.2d 655, 659-60 (11th Cir.), cert. denied, 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 167 (1982). The trial judge's decision to sever is discretionary; appellants must show that the judge abused his discretion in denying their motions to sever, and they can do so only by demonstrating "compelling prejudice." United States v. Capo, 693 F.2d 1330, 1335 (11th Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 1793, 76 L.Ed.2d 359 (1983). Such prejudice can arise from the admission into evidence of an out-of-court statement admissible only against one non-testifying codefendant that implicates another codefendant. See Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Compelling prejudice, in the Bruton context, may occur even though the judge instructs the jury to consider the challenged evidence only against the proper codefendant. Id.
 
 
 39
 Astling, Grego, Terry, Thompson and Tyson argue that the post-indictment telephone conversations Carson had with Rothwell presented a Bruton problem: Carson's statements were out-of-court statements offered for their truth (hearsay), admissible only against Carson himself, and Carson did not testify. Accordingly, appellants assert, their sixth amendment confrontation rights were at stake, and the judge should have severed their trials from that of Carson.
 
 
 40
 The subject matter of the conversations, which Carson initiated a month after he, Tyson, Thompson, and Terry had been indicted, was as follows. Carson and Rothwell first discussed where "the big boy's friend" could be located. Rothwell mentioned that last time he visited "the man" he was "run off." Carson then commented that "these boys here where I'm at have real bad luck." Rothwell stated that he had been visited by government agents. Carson noted that the government had "a good source." Carson and Rothwell then tried to pin down who the informant might be (not mentioning any of the appellants). Carson mentioned that "we've already filed motions" to find out who the informant was.
 
 
 41
 Rothwell then asked whether "everybody" was "ok." Carson said they might "have to do a little time." Rothwell then acted nervous, and the two discussed whether he was in any danger. Carson stated that "they've got one man that was caught in a pickup truck" with "contraband" and he might "end up doing some time." The two men next discussed what Rothwell should do about the plane he had flown; they then returned to the topic of who the informant might have been. Carson then asked Rothwell to call him back the next day.
 
 
 42
 The next day, the two discussed some tax shelters Rothwell was involved in, and their talk turned to what would happen to the four indictees. Carson said that "as long as there's not a driver [pilot] and ... a truck [plane] ... three people will walk out." They again discussed the plane, and how the informant would be "flushed" by the indictees' pretrial motions and his unreliability proven. Carson stated (apparently referring to Thompson) that "he says he ... doesn't know me ... he doesn't know anybody ... he says they're talking about that stuff was imported [but it's not; he] had that ... stashed."
 
 
 43
 This conversation had both nonhearsay and hearsay components. The conversation was nonhearsay in that it showed that Carson trusted Rothwell and was familiar with him. It thus corroborated Rothwell's testimony (which the defendants had impeached) in its entirety. The conversation was also nonhearsay in its entirety against Carson, as an admission. It was hearsay as to all the appellants except Carson to the extent it implied that Carson, Tyson, Thompson and Terry,[5] the four indictees, had acted in concert, as charged in the indictment, prior to their arrests.[6]
 
 
 44
 Bruton does not instruct us on how to judge a confrontation clause claim where the statements involved have a nonhearsay purpose for which they are admissible against all codefendants, as well as a hearsay purpose. Indeed, the Bruton court emphasized that the statements in question were clearly inadmissible under the traditional rules of evidence. 391 U.S. at 128 n. 3, 88 S.Ct. at 1623 n. 3. Cases interpreting Bruton have found its holding inapplicable where the evidence alleged to violate Bruton principles was properly admissible against the complaining party. See Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970); United States v. Goodman, 605 F.2d 870 (5th Cir.1979).
 
 
 45
 We do not need to decide whether this evidence was inadmissible against Tyson, Thompson, and Terry (i.e., whether the prejudicial hearsay value of this evidence substantially outweighed the probative nonhearsay value of the evidence) because we find that the judge's instruction limiting the jury's consideration of the evidence to Carson's case alone was sufficient. In finding the instruction in Bruton to have been insufficient, the High Court noted:
 
 
 46
 [T]here are many circumstances in which this reliance [on the effectiveness of limiting instructions] is justified. Not every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions; instances occur in almost every trial where inadmissible evidence creeps in, usually inadvertently.... [I]n many such cases the jury can and will follow the trial judge's instructions to disregard such information. Nevertheless, ... there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored ... [such as] here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial.
 
 
 47
 391 U.S. at 135-36, 88 S.Ct. at 1627-28.
 
 
 48
 In contrast to the Bruton situation, we have no powerfully incriminating confession in this case. The hearsay inferences that the four indictees, Carson, Thompson, Tyson, and Terry, may have acted in concert were attenuated at best. Both conversations were conducted in obscure codes. One of the codefendants mentioned by identifiable code name ["the physician," Stanley "Doc" Depee] was acquitted. The prosecutor, obeying the limiting instruction, never argued any of the hearsay inferences to the jury. As in Parker v. Randolph, 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979) (interlocking confessions) the "possible prejudice resulting from the failure of the jury to follow the trial court's instructions is not so 'devastating' or 'vital' to the [complaining] defendant to require departure from the general rule allowing admission of evidence with limiting instructions." Id. at 73-75, 99 S.Ct. at 2139-40. In short, we find no Bruton violation in this case.
 
 
 49
 Astling, Grego, and Terry argue in addition that the case against them was so weak that they were unduly prejudiced by the spillover effect of evidence against the coconspirators. This claim is meritless. There was sufficient evidence presented to convict each man, and the trial judge did not abuse his discretion in requiring them to be tried together.
 
 F.
 
 50
 Carson, Tyson, and Uridel seek reversal of their convictions on the ground that evidence of the October 1981 marijuana smuggling venture, presented through the testimony of the two pilots involved in that venture, Rothwell and Seifkis, should have been excluded as overly prejudicial under Fed.R.Evid. 404(b). Uridel challenges the admission of the tape recorded conversations he had with DEA agent Fagan before his arrest, in which they discussed another possible smuggling trip to Colombia, arguing that it, too, was admitted in violation of rule 404(b). Astling, Grego, Terry, Thompson, and Carson challenge the trial judge's instructions to the jury regarding the October 1981 venture, claiming that they were not sufficiently clear for the jury to have understood to whom the evidence of this extrinsic offense applied.
 
 1.
 
 51
 Regarding the first and second contentions, that Rothwell's and Seifkis' testimony about the October 1981 smuggling venture and the Uridel conversations should have been excluded as unduly prejudicial, Fed.R.Evid. 404(b) provides that evidence of other "crimes, wrongs, or acts ... may ... be admissible for other purposes [than to prove character] such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." If evidence of other bad acts is offered for one of these purposes, "[t]he determination must be made whether the danger of undue prejudice outweighs the probative value of the evidence in view of the availability of other means of proof and other factors appropriate for making decisions of this kind under Rule 403." Advisory Committee Note to Fed.R.Evid. 404(b). In this case the prosecutor offered both the testimony of the October 1981 venture and the taped conversation between Uridel and Fagan to show the participants' intent to import drugs as charged in the indictment.
 
 
 52
 Under rule 404(b) the admissibility of extrinsic offense evidence is determined by a two-part test: first, the proffered evidence "must be relevant to an issue other than the defendant's character. Second, the probative value of the evidence must not be substantially outweighed by its undue prejudice, and the evidence must be otherwise admissible under Rule 403." United States v. Mitchell, 666 F.2d 1385, 1389 (11th Cir.), cert. denied, 457 U.S. 1124, 102 S.Ct. 2943, 73 L.Ed.2d 1340 (1982) (following United States v. Beechum, 582 F.2d 898 (5th Cir.1978) (en banc), cert. denied, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979)).
 
 
 53
 We first determine whether the evidence was sufficiently relevant to be admitted against Carson, Tyson, and Uridel. The relevance inquiry itself is two-pronged; we must determine whether from the evidence presented the jury could find that the four men committed the extrinsic offense, and whether the extrinsic offense showed an intent sufficiently similar to that required in one or more of the charged offenses. That the defendant committed the extrinsic offense need not be proven beyond a reasonable doubt or even by clear and convincing evidence. Under Fed.R.Evid. 104(b), such a preliminary fact could be decided by the judge against the proponent of the extrinsic evidence only if a jury could not reasonably find from the evidence that the defendant committed the extrinsic offense. Mitchell, 666 F.2d at 1389 n. 6; Beechum, 582 F.2d at 913.
 
 
 54
 Under this standard, the prosecutor clearly presented sufficient evidence that the defendants in question committed the extrinsic crime. Seifkis and Rothwell both testified extensively to the involvement of Carson and Uridel. In addition, they thoroughly incriminated Thompson. Tyson presents a somewhat closer case because neither Seifkis nor Rothwell actually saw him. However, Rothwell testified that, prior to the October 1981 smuggling flight, Thompson had told him that someone would be at the Soperton Airport to talk with him on radio frequency 122.7. Thompson was with Rothwell on a test flight to check that person's radio range. As they approached the airport, Thompson got on the radio and asked if Bobby was there, and "Bobby, can you hear me." Bobby responded and they talked about directing him to the airport. On February 4, 1982, the first time Rothwell met Bobby Tyson in person, Tyson got into Rothwell's aircraft at the Soperton Airport and referred to the previous trip. Rothwell asked if the Soperton Airport was safe from authorities, and Tyson said it was safe, asking whether he had had any trouble the last time. Later in that flight Rothwell asked whether Tyson still had the same ground-to-air radio. Tyson said he did not; his new radio had a broader range than the one they had talked on previously. Rothwell identified the radio voice he heard in October 1981 as belonging to Bobby Tyson based on Tyson's "unique enough" voice and testified that when he met Tyson he recognized the voice as the one he heard over the radio two to three months before. This evidence was sufficient for a juror reasonably to find that Tyson committed the extrinsic offense. The evidence of intent in the extrinsic offense was also relevant to the defendants' intent in the offenses charged because the extrinsic offense required exactly the same intent as the charged offenses. See Mitchell 666 F.2d at 1389.
 
 
 55
 In deciding whether the prejudicial effect substantially outweighed the probative value of the evidence relating to the October 1981 scheme, we consider the circumstances of the extrinsic offense:
 
 
 56
 Factors to be considered include the strength of the government's case on the issue of intent, the overall similarity of the extrinsic and charged offenses, the amount of time separating the extrinsic and charged offenses, and whether it appeared at the commencement of trial that the defendant would contest the issue of intent.
 
 
 57
 Mitchell, 666 F.2d at 1390, citing Beechum, 582 F.2d at 914-15; United States v. Guerrero, 650 F.2d 728, 734 (5th Cir. Unit A 1981). We do not reverse the trial judge's decision unless we find an abuse of discretion in balancing these concerns. Mitchell, 666 F.2d at 1390.
 
 
 58
 Here, the probative value of the evidence was high. The offenses were almost exactly identical; they occurred only three months apart; and intent was a critical issue at trial. Moreover, there was little likelihood of the evidence causing unfair prejudice; it "was not of a heinous nature, likely to incite the jury to an irrational decision," United States v. McMahon, 592 F.2d 871, 876 (5th Cir.), cert. denied, 442 U.S. 921, 99 S.Ct. 2847, 61 L.Ed.2d 289 (1979); nor was it cumulative or confusing to the jury. United States v. Tunsil, 672 F.2d 879, 881 (11th Cir.), cert. denied, 459 U.S. 850, 103 S.Ct. 110, 74 L.Ed.2d 98 (1982). The trial judge clearly acted within his discretion in admitting the evidence.
 
 
 59
 The taped conversations between Uridel and Fagan, the DEA agent posing as a pilot with whom Uridel was seeking to import more contraband from Colombia, were admissible under the same analysis. Uridel clearly was a participant, and the conversations dealt with a similar scheme close in time to the offenses charged in the indictment. The scheme required the same intent and motive and a similar plan to the charged offenses. The evidence was thus relevant under Beechum, and the trial judge did not abuse his discretion in concluding that the possible prejudicial effect of the evidence did not substantially outweigh its probative value.
 
 2.
 
 60
 Astling, Grego, Terry, Thompson, and Carson challenge the effectiveness of the judge's limiting instruction regarding the evidence of the October 1981 scheme. Since Thompson and Carson were thoroughly implicated by the evidence of the 1981 marijuana importation venture, they cannot show that they were harmed by the instruction. Astling, Grego, and Terry could have a viable argument. The heart of the instruction they challenge is as follows:
 
 
 61
 Evidence or testimony that an accused committed an act at one time or on one occasion is not evidence or proof that such a person did a similar act at another time or on another occasion. In other words, testimony that the Defendant may have committed at some other time an act similar to the act or acts alleged in the indictment in this case may not be considered by the jury in determining whether the accused in fact committed any act alleged in the indictment.
 
 
 62
 They argue that the instruction allowed a "spillover taint" to emanate from the evidence of the October 1981 venture and implicate them. The instruction, they claim, would only have been adequate if it mentioned the defendants not implicated in that venture by name, telling the jury that the extrinsic offense evidence specifically did not apply to Astling, Grego, and Terry. Appellants made no objection to the trial court's instruction on extrinsic offense evidence when it was given; nor did they request another instruction prior to the court's final charge to the jury. They first objected only after the jury was deliberating.
 
 
 63
 We find no flaw in the instruction. It merely stated that where there is evidence that a defendant committed a prior crime the jury may not use such evidence to determine whether he committed a criminal act alleged in the indictment. There was no reasonable way to read that instruction as implicating any accused who committed no prior criminal act in evidence. Nor was it confusing enough to risk the jury's attributing offenses to those who did not commit them. Moreover, the prosecution never argued that the extrinsic offenses should be used to indicate a nonparticipating codefendant's guilt. See United States v. Miranda, 593 F.2d 590 (5th Cir.1979). At all phases of the trial the prosecution and defense attorneys were scrupulous in clarifying who was implicated by what testimony. We find no prejudice to Astling, Grego or Terry caused by this instruction; the extrinsic offense evidence was sufficiently limited for the jury to understand adequately to whom it applied.
 
 G.
 
 64
 The defendants called Thomas and Brian Olmstead, a father and son from Little Rock, Arkansas who had known Rothwell, to testify. Their testimony was offered to show that Rothwell had borrowed a plane from them under suspicious circumstances and returned it damaged in a way that might be consistent with Rothwell's having used it to smuggle drugs sometime between January 27, 1982, when he borrowed the plane, and February 2, 1982, when he returned it. This, defense counsel argued, would impeach Rothwell's testimony by implying that he had made one more smuggling flight than he had testified to, and by implying that he had not attended a particular meeting with some of the defendants on January 28, 1982.
 
 
 65
 In the course of testifying, Brian Olmstead stated that he would not believe Rothwell under oath. On cross-examination, he admitted that though he had known Rothwell twelve years, his opinion as to Rothwell's truthfulness was based solely on Rothwell's deceiving his father to obtain the plane on January 27.
 
 
 66
 The government twice objected to the testimony of the Olmsteads because it did not establish either of the points which defense counsel sought to make, and because the testimony was irrelevant. The court overruled the first objection. The court sidestepped the second objection, made while Brian Olmstead was testifying, by according the prosecutor a brief voir dire inquiry of the witness in the midst of the witness' direct examination. The next morning, the prosecutor renewed his objection and requested that defense counsel not be permitted to argue the Olmsteads' testimony to the jury. Defense counsel responded that the testimony had "some probative value" to show that Rothwell had "hauled a load of dope" in the borrowed plane, and also that the testimony should be admitted under Fed.R.Evid. 608 as conflicting with Rothwell's testimony that he had met with certain defendants on January 28. The government pointed out that the Olmsteads had had no personal knowledge of most of the events to which they testified. Defense counsel pressed further, asking whether the judge contemplated striking Brian Olmstead's testimony that he would not believe Rothwell under oath. The judge answered that as the statement was based on only one transaction and not on Rothwell's reputation for veracity in the community, he would strike it. Defense counsel urged the court to let the statement stand because the prosecutor, not having objected to the witness' specific statement that he would disbelieve Rothwell as lacking a proper predicate, had waived the objection. The court, after considering the arguments, struck both witnesses' testimony in its entirety, including the opinion as to Rothwell's truthfulness.
 
 
 67
 After the jury had begun deliberating, defense counsel asked the court to consider reopening the case to admit Brian Olmstead's statement about Rothwell's credibility as opinion testimony, citing United States v. Watson, 669 F.2d 1374 (11th Cir.1982). The judge stated that he might have permitted the statement to stand had the defense offered it as an opinion. He observed, however, that the opinion had been so limited on cross-examination that its probative value was extremely doubtful; he thus refused to reopen the case and instruct the jury to consider the statement as opinion testimony. The judge also noted that the witness' testimony had involved a "great deal more" that was irrelevant and otherwise inadmissible.
 
 
 68
 Fed.R.Crim.P. 51 requires that "a party, at the time [a] ruling or order of the court is made or sought, make ... known to the court the action which he desires the court to take or his objection to the action of the court and the grounds therefor." (emphasis added.) The purpose of this rule is to assure that the trial judge makes an informed decision, and to allow the judge and opposing counsel to take whatever corrective action is needed. See United States v. Walker, 449 F.2d 1171 (D.C.Cir.1971); 8B Moore, Federal Practice p 51.02 (1983).
 
 
 69
 In this case, defense counsel proffered the Olmsteads' testimony first to suggest Rothwell had taken an extra smuggling flight and had not attended a meeting. The testimony clearly failed to establish these goals; it was merely a longwinded account of Rothwell's borrowing a plane and returning it damaged five days later. Defense counsel failed to show that the damage to the plane could have been caused only by a smuggling flight; the witnesses testified to no suspicious marijuana smell or residue; and the tachometer reading was inconsistent with Rothwell having flown the plane to South America. With regard to the January 28 meeting, even if Rothwell had flown to South America the flight could have occurred any time during the week he had the plane and obviously could not have precluded Rothwell from attending the meeting. Moreover, we have no proof that Rothwell even flew the plane himself.
 
 
 70
 When the judge indicated that he would strike Brian Olmstead's statement about Rothwell's credibility, defense counsel pressed another ground, arguably untimely under Rule 51, that the testimony dealt with Rothwell's reputation. The judge considered that argument and found it inapposite because the statement was based on one transaction. Defense counsel apparently agreed when he moved on to argue that the prosecutor had waived his objection to an improper predicate.
 
 
 71
 Since defense counsel at no time during the trial presented the grounds for admission they now urge, the judge had no opportunity to consider those grounds in the ordinary course of the trial, and the prosecutor had no opportunity to present further argument against admission of the evidence. The presentation of new grounds for admitting the evidence, after both sides had rested and the jury was out, was too late to preserve the issue, under rule 51, for appellate review. See United States v. Arteaga-Limones, 529 F.2d 1183, 1198-99 (5th Cir.), cert. denied, 429 U.S. 920, 97 S.Ct. 315, 50 L.Ed.2d 286 (1976); United States v. Fendley, 522 F.2d 181, 185-86 (5th Cir.1975). See also F.R.Crim.P. 30 ("No party may assign as error any portion of a charge ... unless he objects thereto before the jury retires to consider its verdict, stating distinctly ... the grounds of his objection.")
 
 H.
 
 72
 Tyson contends that the jury had insufficient evidence to convict him of the conspiracy, importation, and distribution counts. He also argues that a piece of evidence before the jury, Carson's telephone number on a scrap of paper, should have been suppressed because it was seized from him pursuant to an unlawful arrest, and thus (1) should not be counted in assessing the sufficiency of the evidence against him, and (2) violated his constitutional rights, warranting reversal of his conviction. We first discuss the arrest and search incident thereto.
 
 1.
 
 73
 The trial court found that the arresting officer had the requisite probable cause to arrest Tyson; the record fully supports this determination. An arrest is founded on probable cause when reasonably trustworthy facts and circumstances are within the knowledge of the arresting officer to warrant a man of considerable caution in the belief that an offense has been ... committed. United States v. Agostino, 608 F.2d 1035, 1037 (5th Cir.1979). Where, as here, there is at least minimal communication between different officers, the collective knowledge of the officers determines probable cause. Id.
 
 
 74
 At the time of the arrest, the officers knew the following about Tyson. An informant with whom the agents had worked for three months, and whose information about the conspiracy had so far been completely reliable, had told them about (1) speaking with a man over ground-to-air radio prior to and during the October 1981 smuggling run whom he believed at the time to be Tyson; (2) Tyson's later reference to his own presence and involvement in that October 1981 episode; (3) the flight with Tyson in February 1982 when Tyson directed Rothwell to possible alternate landing sites in the country surrounding Soperton, and the conversation during that flight relating to the upcoming February 9 drug importation effort; (4) Tyson's speaking with two men and the sheriff at the Soperton Airport and his immediate comments to Rothwell that he had them "straightened out" about using the airport to smuggle marijuana, and that the sheriff was "cool" about landing the marijuana; and (5) that Carson had told him to expect to see Tyson at the airport the evening of February 9.
 
 
 75
 The investigators also knew the events that transpired on the evening of February 9. They knew from their surveillance that Tyson was not at home on that evening. They knew that someone resembling Tyson had been seen running away from the pickup truck into which the marijuana had been loaded, and that a ground to air radio was found in the truck, tuned to the frequency on which Rothwell had told Tyson at the time of their flight together that he could be contacted. In addition, during one of the recorded conversations between Thompson and Rothwell in Rothwell's Ocala motel room, Thompson had implicated Tyson. Clearly, then, the arresting officer had probable cause to arrest Tyson, and thus to search him incident to the arrest. The pieces of paper with the further incriminating phone number were therefore properly before the jury.
 
 2.
 
 76
 In reviewing the sufficiency of the evidence to support a criminal conviction, we inquire whether "a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." United States v. Lee, 694 F.2d 649, 652 (11th Cir.1983) citing United States v. Bell, 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc). As to the sufficiency of the evidence at trial to convict Tyson, all of the above information came out at trial. In addition, Tyson offered an alibi that he had been home all evening working on a friend's car with that friend. On rebuttal, prosecution witnesses testified that nobody had been at the Tyson house, that no lights had been on in the garage, and that the friend, who testified that he remembered the date because it was the day before his February 10 doctor's appointment, saw the doctor on February 12, not February 10. Ample evidence existed for the jury to conclude that Tyson was involved in the conspiracy to import and to distribute the marijuana, and that he actually did pick up the marijuana for the purpose of distributing it.
 
 I.
 
 77
 Carson, Uridel, Astling, and Grego argue that the district court erred in failing to conduct an evidentiary hearing before ordering them to deposit their fines pending appeal: the government filed a motion to require such deposits on August 12, 1982, and the court issued an order to that effect on the same day. Appellant Uridel filed a motion to set aside the order which was denied.
 
 
 78
 Appellants cite United States v. Graziano, 682 F.2d 1384, 1385 (11th Cir.1982), for the proposition that a district court must hold an evidentiary hearing before ordering a deposit of fines pending appeal. That case supports no such proposition. In Graziano, the prosecutor moved the appellate court for an order requiring deposit of fines pending appeal. A panel of this court pointed out to the prosecutor that he should have brought such a motion in the district court, not the court of appeals, saying:
 
 
 79
 If it be the policy of the Executive to seek this sort of relief, it should be sought in the district court where evidentiary hearing may be had to determine the need for the relief sought and the ability of the appellee to respond to such order as may be sought.
 
 
 80
 Id. at 1385. The case does not stand for the proposition that an evidentiary hearing is always required.
 
 
 81
 Appellants argue that an evidentiary hearing should have been held in this case because the district court did not have sufficient information to evaluate the government's motion. However, the court was familiar with the evidence adduced at trial, and at the bail hearings, and the presentence report on each appellant. Moreover, it had heard the evidence offered by appellant Uridel on his motion to reconsider the order requiring the deposit of fines pending appeal. Appellants point to no reason why the court was not sufficiently familiar with their chances of success on appeal and their financial situations to enter the discretionary order in question.
 
 
 82
 AFFIRMED.
 
 
 
 *
 Honorable Seybourn H. Lynne, U.S. District Judge for the Northern District of Alabama, sitting by designation
 
 
 [1]
 Appellants Astling, Carson, Thompson, and Tyson were convicted of all counts. Appellants Grego and Uridel were convicted of conspiracy to import marijuana and importing marijuana. Appellant Terry was convicted of conspiracy to possess marijuana with intent to distribute, and possession of marijuana with intent to distribute. Delbert Sinor, Stanley "Doc" Depee, and John Offuit were acquitted of all charges
 
 
 [2]
 The government provided a reasonable explanation for the superseding indictment. The DEA's investigation disclosed that the defendants had engaged in criminal activity in both Little Rock, Arkansas, and Georgia, and the government had not decided where to seek an indictment. It was apparently only after the original indictment had been returned that the prosecutors in Little Rock and in Georgia decided to consolidate the case in the Southern District of Georgia
 
 
 [3]
 In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981. In Stein v. Reynolds Securities, Inc., 667 F.2d 33 (11th Cir.1982), this court adopted as binding precedent all decisions of Unit B of the former Fifth Circuit handed down after September 30, 1981
 
 
 [4]
 Tyson adopted his co-appellants' Bruton claim at oral argument, although he did not present it in his brief
 
 
 [5]
 The telephone conversation did not present a Bruton problem as to Astling and Grego in any way whatsoever; it simply made no reference to them or any involvement they might have had in the scheme
 
 
 [6]
 While these facts were not explicitly asserted in Carson's statements, they were matters within the statement offered for their truth. Their value to the prosecution did not lie in their being said or implied, but in whether they were true. Carson's credibility on the issue of whether the four men had actually been in contact was thus an issue, and he should have been subject to cross-examination if the statements were offered to show the four men had been in contact. See Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949) (statement by one co-conspirator to coconspirator-turned-state's-witness that "it would be better for us two girls to take the blame than [the defendant] because he couldn't stand it" inadmissible hearsay against defendant because it was an unsworn out-of-court declaration of the defendant's guilt.)